# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ARMANDO TREVINO PARRAZ, JR.,**

      **Plaintiff,**

      **vs.**                                    **Civ. No. 17-143  KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed June 23, 2017, in support of Plaintiff Armando Trevino Parraz, Jr.'s ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits.  On August 18, 2017, Plaintiff filed his Motion to Reverse and Remand For A Rehearing With Supporting Memorandum ("Motion").  (Doc. 18.)  The Commissioner filed a Response in opposition on October 19, 2017 (Doc. 19), and Plaintiff filed a Reply on November 3, 2017.  (Doc. 22.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 8, 10, 12.)

# I.  Background and Procedural Record

Claimant Armando Trevino Parraz, Jr. ("Mr. Parraz") alleges that he became disabled on July 24, 2012, at the age of forty because of posttraumatic stress syndrome ("PTSD"), major depressive disorder, and generalized anxiety.  (Tr. 232, 236, 267, 270.[2])  Mr. Parraz completed one year of college and has worked as a jewelry vendor, warehouse door adjuster, call center customer and sales associate, and grocery vendor.  (Tr. 271, 278, 312-22.)  Mr. Parraz reported he stopped working on July 24, 2012, due to his medical conditions.  (Tr. 270.)

On July 28, 2014, Mr. Parraz protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*.  (Tr. 17, 232-35.)  He also protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.   (Tr. 17, 236-39.)  Mr. Parraz's applications were initially denied on February 10, 2015.  (Tr. 84, 85, 86-96, 97-107, 142-45, 146-49.)  They were denied again at reconsideration on June 30, 2015.  (Tr. 108, 109, 110-25, 126-41, 151-53, 154-56.)  On August 26, 2015, Mr. Parraz requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 157-58.)  The ALJ conducted a hearing on August 10, 2016.  (Tr. 41-83.)  Mr. Parraz appeared in person at the hearing with attorney representative Michael Armstrong.  (*Id*.)  The ALJ took testimony from Mr. Parraz (Tr. 45-76), and an impartial vocational expert ("VE"), Thomas Greiner (Tr. 77-82).  On September 29, 2016, ALJ Lillian Richter issued an unfavorable decision.  (Tr. 14-34.)  On November 29, 2016, the Appeals Council issued its decision denying Mr. Parraz's request for review and upholding the ALJ's final decision.  (Tr. 1-4.)  On January 31, 2017, Mr. Parraz timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 15) that was lodged with the Court on June 23, 2017.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)      At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)      At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)      At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)      If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.    <u>Standard of Review</u>**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d

1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. <u>Analysis</u>

The ALJ made her decision that Mr. Parraz was not disabled at step four of the sequential evaluation. (Tr. 31-32.) The ALJ, however, also made alternative step five findings that based on Mr. Parraz's age, education, work experience, RFC, and the testimony of the VE, there were other jobs that exist in significant numbers in the national economy that Mr. Parraz could perform. (Tr. 32-33.) Specifically, the ALJ determined that Mr. Parraz met the insured status requirements of the Social Security Act through December 31, 2014, and that Mr. Parraz had not engaged in substantial gainful activity since July 24, 2012. (Tr. 19-20.) She found that Mr. Parraz had mental impairments variously diagnosed to include major depressive disorder, recurrent, severe without psychotic features; borderline personality traits; PTSD; mood disorder, NOS; personality disorder with avoidant, dependent, and histrionic traits; generalized anxiety disorder; dysthymia, panic disorder with agoraphobia; and ADHD combined type. (Tr. 20.)

The ALJ also found that Mr. Parraz had nonsevere impairments of cannabis abuse disorder and obesity. (*Id.*) The ALJ, however, determined that Mr. Parraz's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 21-23.) As a result, the ALJ proceeded to step four and found that Mr. Parraz had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> the claimant can perform simple, routine, and repetitive work; with occasional interaction with supervisors and co-workers, and incidental interaction with the public. He cannot perform work at an assembly line production pace or perform work in tandem with other employees. He is limited to making simple work related decisions in a workplace with few changes in the routine work setting.

(Tr. 23.) The ALJ further concluded at step four that Mr. Parraz was able to perform his past relevant work as a stock clerk. (Tr. 31-32.) In the alternative, the ALJ determined at step five that Mr. Parraz could perform work as a cuff folder, DOT No. 685-687-014, and motor polarizer, DOT No. 715.687-090. (Tr. 32-33.)

In arriving at her RFC finding, the ALJ relied primarily on State agency nonexamining psychological consultant Diane Hyde, Ph.D.'s assessment. (Tr. 28.) Dr. Hyde reviewed Mr. Parraz's medical records and, on June 30, 2015, assessed that (1) he could perform simple and some complex tasks with routine supervision; (2) he could relate to others on a superficial work basis; and (3) could adapt to a simple and some complex work situation. (Tr. 138.) In according great weight to Dr. Hyde's assessment, the ALJ also noted that "more recent evidence supports additional limitations." (Tr. 28.) The more recent evidence included functional assessments prepared by LPCC Jennifer Webb and psychological consultant Esther Davis, Ph.D. However, while the ALJ's RFC is more restrictive than Dr. Hyde's assessed limitations, the ALJ did not adopt the even more restrictive limitations assessed by LPCC Webb and Dr. Davis.

Mr. Parraz makes five arguments in support of remand as follows: (1) the ALJ's decision does not include a function-by-function assessment of Mr. Parraz's mental limitations; (2) the ALJ failed to apply the correct legal standard in evaluating Dr. Esther Davis's psychological evaluation and opinion; (3) the ALJ failed to apply the correct legal standard in evaluating LPCC Jennifer Webb's assessment of Mr. Parraz's ability to do work related mental activities; (4) the ALJ failed to resolve the conflict between the VE's testimony and the DOT for the job of stock clerk; and (5) the ALJ's step five findings are not supported by substantial evidence because the number of jobs the VE identified is not reliable. (Doc. 18 at 11-25.) For the reasons discussed below, the Court finds that the ALJ failed to properly evaluate LPCC Webb's assessment pursuant to SSR 06-03p, and failed to properly evaluate Dr. Esther Davis's psychological evaluation and assessment, and remands on these grounds.

## A. Jennifer Webb, LPCC

On October 18, 2012, Mr. Parraz presented to Valencia Counseling Services and saw LPCC Jennifer Webb on a referral from UNMH.[4] (Tr. 481-84, 487-98.) Mr. Parraz reported his recent hospitalization at UNMH for suicidal ideation and expressed feeling sad and hopeless. (Tr. 483, 487.) After completing an initial evaluation, LPCC Webb indicated Axis I diagnoses of Major Depressive Disorder Recurrent, Severe; Anxiety Disorder, NOS; and Cannabis Abuse. (Tr. 483.) She assessed a GAF score of 53.[5] (Tr. 484.) LPCC Webb stated that Mr. Parraz's condition showed a significant behavioral and psychological syndrome or pattern that substantially or materially impaired his ability to function. (Tr. 496.) LPCC Webb noted that

[4] Mr. Parraz was admitted to UNM Adult Behavioral Health from September 23, 2012, through September 27, 2012, for depressive neurovegetative symptoms and suicidal ideation. (Tr. 439-43.)

[5] A GAF score of 53 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000).

Mr. Parraz was open to treatment and would attend individual counseling and obtain medication management services.[6] (*Id.*) LPCC Webb indicated that Mr. Parraz would be discharged from treatment when he was able to decrease his anxiety and depression by 50%. (*Id.*)

Treatment notes indicate that LPCC Webb counseled Mr. Parraz from October 2012 through January 2016, and referred him for psychiatric evaluation and medication management to CNS Carol Lynn Hunter and NP Carol Mills. (Tr. 481-98, 501-06, 512-19, 522-29, 530-40, 634-48, 650, 653-58.) On July 24, 2014, LPCC Webb prepared a "To Whom It May Concern" letter and stated that Mr. Parraz had been in individual counseling with her "for over a year." (Tr. 546.) She stated therein that Mr. Parraz had been diagnosed with PTSD, depression and anxiety, and that he struggled with anxiety and other symptoms on a daily basis. (*Id.*) On June 22, 2015, LPCC Webb prepared a Third-Party Adult Function Report on Mr. Parraz's behalf and reported, *inter alia*, that anxiety made it difficult for Mr. Parraz to stay in one place and made him very irritable; depression made Mr. Parraz want to isolate and not to want to be around people or leave his house; flashbacks to past traumas were easily triggered; he does not sleep well; he required his family's help for personal care and taking medications; his activities were limited to simple meal preparation and minimal chores; he was unable to complete tasks without an outside person reminding him; and his concentration was a problem because he forgets and is easily distracted. (Tr. 347-54.)

On January 25, 2016, after treating Mr. Parraz for three years, LPCC Webb prepared a Medical Assessment of Ability To Do Work-Related Activities (Mental) on Mr. Parraz's behalf. (Tr. 660-61.) She assessed that Mr. Parraz had *slight limitations* in his ability to (1) remember

---

[6] On January 28, 2013, Carol Lynn Hunter, CNS, provided a psychiatric evaluation of Mr. Parraz and obtained Mr. Parraz's informed consent for psychotropic medication. (Tr. 501-06, 512-13.) Treatment notes indicate that Mr. Parraz would engage in individual counseling every other week. (Tr. 540.)

locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (5) sustain an ordinary routine without special supervision; (6) make simple-work-related decisions; (7) ask simple questions or request assistance; (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (9) be aware of normal hazards and take adequate precautions. (*Id.*) She assessed he had *moderate limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods of time; (4) interact appropriately with the general public; (5) respond appropriately to changes in the work place; and (6) set realistic goals or make plans independently of others. (*Id.*) She assessed that Mr. Parraz had *marked limitations* in his ability to (1) work in coordination with/or proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (5) travel in unfamiliar places or use public transportation. (*Id.*)

LPCC Webb also determined that the severity of Mr. Parraz's anxiety and depression met the criteria of Listings 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. (Tr. 662-63.)

The ALJ accorded little weight to LPCC Webb's functional assessment of Mr. Parraz's ability to do work related mental activities. (Tr. 27.) In so doing, the ALJ explained that LPCC Webb was not an "examining or treating source." (*Id.*) She also explained that LPCC Webb's

assessment was not supported by her observations and notes. (*Id.*) Specifically, the ALJ explained that LPCC Webb noted that Mr. Parraz's mental impairments were stable, the he believed cannabis helped his condition, that he had some close friends and was close with his immediate family, that counseling was helpful, and that his mood was improved with medication. (*Id.*) Finally, the ALJ explained that LPCC Webb's assessment that Mr. Parraz had marked limitations in traveling to unfamiliar places was inconsistent with the record because the record supported that Mr. Parraz was capable of driving himself to his counseling appointments. (*Id.*)

Mr. Parraz argues that LPCC Webb's extensive treatment provided her with a longitudinal picture of his impairments, and that her assessment largely concurred with other evidence in the record. (Doc. 18 at 18-19.) He also argues that the ALJ's explanation for discounting LPCC Webb's assessment amounts to speculation, and that the ALJ failed to point to specific contradictory medical evidence to support her findings. (*Id.* at 19-20.) The Commissioner contends that the ALJ considered LPCC Webb's assessment and properly accorded it little weight because it was not supported by her observations and notes. (Doc. 19 at 9-10.)

The regulations contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)). Recognizing the growth of managed health care in recent years and the increasing use of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse
> practitioners, physician assistants, and licensed clinical social workers, have

increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinion from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3. Thus, evidence from other medical sources[7] and non-medical sources[8] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2. "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source'[9] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may

---

[7] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2.

[8] Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2.

[9] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1.

determine that opinions from such sources are entitled to greater weight than a treating source medical opinion. SSR 06-03p, 2006 WL 2329939, at *6. The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5.

The ALJ's explanations for according little weight to LPCC Webb's functional assessment are not supported by substantial evidence, amount to speculation, and fail to demonstrate that she properly considered the relevant factors described in SSR 06-03. Here, the medical record evidence supports that LPCC Webb assumed the greater percentage of Mr. Parraz's mental health treatment for an extended period of time. Thus, LPCC Webb's findings and opinion as an other medical source – in particular that Mr. Parraz had *marked limitations* in his ability to (1) work in coordination with/or proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (5) travel in unfamiliar places or use public transportation - was significant and should have been properly considered to determine the severity of and the impact on Mr. Parraz's ability to perform work related mental activities. *See* SSR 06-03p, 2006 WL

2329939, at *3.  Although the ALJ points to certain medical record evidence wherein LPCC Webb noted that Mr. Parraz responded to medication and counseling and was stable, it is mere speculation that Mr. Parraz's favorable response to medication and treatment rendered him less restricted in his ability to do work related mental activities than LPCC Webb assessed.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (noting that treatment notes indicating that a claimant was "stable" may have simply meant that claimant was not suicidal); *see also McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgment, speculation or lay opinion").  Moreover, the medical records indicate that despite Mr. Parraz's favorable response to medication and treatment, his treatment providers' diagnoses and assigned GAF scores remained consistent over the course of his ongoing treatment,[10] and that he needed to remain in treatment because he had not yet met the discharge goal.[11]  LPCC Webb's assessment is also

---

[10] On October 18, 2012, LPCC Jennifer Webb indicated Axis I diagnoses of Major Depressive Disorder, recurrent, in part remission; Anxiety Disorder, NOS; Cannabis Abuse; GAF – 53 (Tr. 484-84); on June 21, 2013, LPCC Jennifer Webb indicated Axis I diagnoses of Major Depressive Disorder Recurrent, in part remission; Anxiety Disorder, NOS; GAF – 60 (Tr. 481-82); on September 16, 2013, CNS, CNP Carol Hunter, Ph.D., indicated an Axis I diagnosis of PTSD; GAF – 52 (Tr. 522-29); on July 24, 2014, LPCC Jennifer Webb indicated Axis I diagnoses of PTSD, Stable; Major Depressive Disorder Recurrent, Moderate; Generalized Anxiety Disorder; GAF – 57 (Tr. 530-40); on June 12, 2015, NP Carol Mills indicated Axis I diagnoses of PTSD, Stable; Major Depressive Disorder Recurrent Moderate, Stable (Tr. 653-58); on September 9, 2015, LPCC Jennifer Webb indicated Axis I diagnoses of PTSD, Stable; Major Depressive Disorder Recurrent, Stable; Generalized Anxiety Disorder; GAF – 57 (Tr. 634-46).

[11] LPCC Webb planned to discharge Mr. Parraz when he was able to decrease his anxiety and depression by 50%. (Tr. 496.  On July 8, 2016, LPCC Webb noted a new projected discharge date of July 28, 2017.  (Tr. 730.)

consistent with Dr. Esther Davis's opinion[12] and CNP-BC Maureen Koloneir's functional assessment.[13]

Finally, the ALJ's other explanations for discounting LPCC Webb's assessment; *i.e.,* that Mr. Parraz drives himself to his counseling appointments and has some close friends and family, are insufficient. First, Mr. Parraz's ability to drive himself to his counseling appointment, a *familiar* place, is not a valid reason to discount LPCC Webb's assessment that Mr. Parraz had marked limitations traveling in *unfamiliar* places.[14] Second, the ALJ failed to demonstrate how having some close friends[15] and being close to certain family members refutes LPCC Webb's functional assessment related to Mr. Parraz's ability to do work related mental activities.

The ALJ failed to properly consider and weigh LPCC Webb's opinion pursuant to SSR 06-03p, and her basis for rejecting the opinion is not supported by substantial evidence. This is reversible error.

### B.      Esther Davis, Ph.D.

On March 24, 2016, Esther Davis, Ph.D., performed a psychological evaluation of Mr. Parraz based on a referral from Mr. Parraz's attorney. (Tr. 702-08.) Dr. Davis reviewed

---

[12] *See* Section III.B, *infra*.

[13] On February 25, 2016, Maureen Kolomeir, CNP-BC, prepared a Medical Assessment of Ability To Do Work-Related Activities (Mental) on behalf of Mr. Parraz. (Tr. 666-67.) She assessed, *inter alia*, that Mr. Parraz had marked limitations in his ability to (1) work in coordination with/or proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (6) travel in unfamiliar places or use public transportation. (*Id.*) The ALJ accorded CNP-BC Kolomeir's opinion little weight because the medical record evidence did not contain any treatment notes authored by her. (Tr. 28.)

[14] Mr. Parraz reported and testified that his mother usually drives him to his appointments, although he has a driver's license and is capable of driving on his own if necessary. (Tr. 65, 550, 704.)

[15] On March 24, 2016, Mr. Parraz reported to Dr. Davis that he has no friends as his last close friend committed suicide in January 2015. (Tr. 705.)

Mr. Parraz's medical records from the University of New Mexico, Valencia Counseling,[16] and Valle Del Sol.[17] (Tr. 702). She also reviewed State Agency examining psychological consultant Carl Adams, Ph.D.'s consultative report[18]; LPCC Jennifer Webb's medical source statement; and CNP Maureen Kolomeir's medical source statement. (*Id.*) Dr. Davis conducted a clinical interview and performed a mental status examination. (*Id.*) Dr. Davis also administered standardized psychological tests, including the Montreal Cognitive Assessment, the Burns Depression Inventory, and the Generalized Anxiety Disorder 7-Item Scale. (*Id.*) Based on her mental status exam and testing, Dr. Davis diagnosed:

| | |
|---|---|
| Axis I: | 309.81 Post Traumatic Stress Disorder |
| | 300.02 Generalized Anxiety Disorder |
| | 296.33 Major Depressive Disorder, Recurrent, Moderate without Psychotic Features |
| | 300.4 Dysthymia |
| | 300.21 Panic Disorder with Agoraphobia |
| | 314.01 Attention Deficit Hyperactivity Disorder/Combined Type |
| Axis II: | Deferred |
| Axis III: | Back Spasms |
| Axis IV: | Financial, occupational, social, familial |
| Axis V: | Current GAF = 43[19]    Past Year GAF = 43 |

---

[16] Mr. Parraz treated with LPCC Jennifer Webb and CNS Carol Lynn Hunter at Valencia Counseling from October 2012 through June 2013. (Tr. 481-98, 501-06, 512-19.)

[17] Mr. Parraz treated with LPCC Jennifer Webb and CNS Carol Lynn Hunter at Valle Del Sol from September 2013 through January 2016. (Tr. 522-40, 546, 634-48, 650, 653-58, 660-61.)

[18] On February 3, 2015, State agency examining psychological consultant Carl Adams, Ph.D., evaluated Mr. Parraz. (Tr. 548-50.) Dr. Adams indicated an Axis I diagnosis of Mood Disorder NOS, an Axis II diagnosis of personality disorder with avoidant, dependent and histrionic traits, and assigned a GAF score of 70 (mild symptoms). (Tr. 550.) Dr. Adams assessed that Mr. Parraz has no limitations with detailed instructions and no limitations with short and simple ones; had no limitations with concentration and task persistence; had moderate limitations interacting with coworkers and supervisors; and had no limitations being aware of normal hazards. (*Id.*) The ALJ accorded Dr. Adams' opinion some weight. (Tr. 29.)

[19] A GAF score of 43 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000).

(Tr. 707.)  Dr. Davis summarized that

> . . .   According to the medical records reviewed, Mr. Parraz has been in psychiatric treatment fairly consistently.  Those records date back to at least 2012. All of these records indicate that Mr. Parraz suffers from Post Traumatic Stress Disorder, Generalized Anxiety Disorder, Major Depressive Disorder, Dysthymia, Panic Disorder With Agoraphobia, and Attention Deficit Hyperactivity Disorder. My examination of Mr. Parraz concurs with these findings.  Additionally, he continues to see Jennifer Webb, LPCC for psychotherapy and is compliant with his medication regimen[].

> The only medical report reviewed that showed any inconsistencies from all of the rest of the medical reports reviewed and from my own evaluation was the one from Carl Adams, Ph.D.  Dr. Adams diagnose[d] Mr. Parraz on Axis I with Mood Disorder NOS.  However, it is clear that Mr. Parraz is suffering with Major Depression and has a history of suffering on a daily basis with a mild, chronic, long-standing depression, diagnosed as Dysthymia.  Additionally, Dr. Adams makes no diagnosis of Mr. Parraz's anxiety disorders, including his suffering with Post Traumatic Stress Disorder when, again, it is clear that Mr. Parraz clearly fits the criteria for Generalized Anxiety Disorder, Panic Disorder, and Post Traumatic Stress Disorder.  On Axis IV, Dr. Adams gives the diagnosis of "Mild," however, there is no mention of the psychological stressors that need to be enumerated on this axis.  He also states that Mr. Parraz has no limitations with detailed or short instructions and has no limitations with concentration or persistence.  This is in direct contrast with my findings as Mr. Parraz had a very difficult time with concentration, focus, and memory.  In fact, the MOCA suggests mild cognitive impairment.  Furthermore, Dr. Adams gave Mr. Parraz a very high GAF score which I find to be very inaccurate as Mr. Parraz has had several suicide attempts and hospitalizations.  He has a well-documented history of having a difficult time with daily functioning, which he continues to this day.  It does not seem that Dr. Adams reviewed any medical records and he also made significant errors, e.g., reporting that Mr. Parraz was not in treatment at the time of the evaluation, when other medical records state that he was. Dr. Adams also states that Mr. Parraz exaggerated, however, I did not experience this in my evaluation of him. Additionally, Mr. Parraz states that Dr. Adams' evaluation of him only took 15 minutes.  That would hardly be enough time to make an accurate evaluation.

(Tr. 707-08.)

Dr. Davis assessed Mr. Parraz's ability to do work-related activities (mental) as follows:

Understanding and Memory

> Marked limitations to understand and remember detailed instructions.

Moderate limitations to (1) remember locations and work-like procedures; and (2) understand and remember very short and simple instructions.

## Sustained Concentration and Persistence

Marked limitations to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods of time (*i.e.,* 2-hour segments); (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) work in coordination with/or proximity to others without being distracted by them and (5) complete normal workday and work week without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.

Moderate limitations to (1) to carry out very short and simple instructions; and (2) sustain an ordinary routine without special supervision.

Slight limitations to make simple work-related decisions.

## Social Interaction

Marked limitations to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

Moderate limitations to (1) ask simple questions or request assistance; and (2) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

## Adaptation

Marked limitations to travel in unfamiliar places or use public transportation.

Moderate limitations to (1) respond appropriately to changes in the work place; and (2) set realistic goals or make plans independently of others.

Slight limitations to be aware of normal hazards and take adequate precautions.

(Tr. 709-10.)   Finally, Dr. Davis determined that the severity of Mr. Parraz's anxiety and depression met the criteria of Listings 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders.  (Tr. 711-12.)

The ALJ accorded little weight to Dr. Davis's GAF score and accorded some weight to her opinion.  (Tr. 30.)  The ALJ explained generally that Dr. Davis's evaluation appeared to be based primarily on the Mr. Parraz's subjective reports.  (*Id.*)  As to the GAF score, the ALJ explained that it varied by ten points from GAF scores regularly assigned by Mr. Parraz's examining and treating sources.  (*Id.*)  Regarding Dr. Davis's opinion, the ALJ explained that some of her restrictions were based on erroneous information that conflicted with other evidence that Mr. Parraz was able to drive himself to appointments and travel by airplane between Albuquerque and Carlsbad; responded favorably to medication and treatment; reported an ability to get around and function; and that Mr. Parraz helped care for his niece when in Albuquerque. (*Id.*)

Mr. Parraz argues that the ALJ improperly rejected Dr. Davis's evaluation and assessment because she made speculative inferences from medical reports and provided only vague references to medical evidence inconsistencies.  (Doc. 18 at 13-17.)  The Commissioner contends that the ALJ considered Dr. Davis's opinion and permissively found that it was entitled to "some weight" having found certain restrictions were based on erroneous information.  (Doc. 19 at 7-8.)

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.   *See* 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2)(ii), 416.927(c) and 416.927(e)(2)(ii); *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[a]n ALJ must evaluate every medical opinion in the record,

although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."). "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[20] An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion. *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007). However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ's decision for according weight to medical opinions must be supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005). An ALJ is required to give controlling weight to the opinion of a treating physician if is it supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.* Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Hamlin*, 365 F.3d at 1215.

The ALJ's explanations for discounting Dr. Davis's evaluation and assessment are not supported by substantial evidence. The ALJ begins her explanation by stating that Dr. Davis's evaluation was not supported because it was based primarily on the claimant's subjective reports,

---

[20] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

some of which the ALJ found incredible. (Tr. 30.) This explanation, however, ignores that Dr. Davis reviewed Mr. Parraz's medical records from 2012 forward, and administered standardized psychological tests, as part of her evaluation and assessment. The ALJ provided no explanation at all for rejecting the objective results obtained from properly administered standardized psychological testing measures; *i.e.,* Burns Depression Inventory demonstrated *severe depression*; Generalized Anxiety Disorder 7-Item Scale demonstrated *severe anxiety*; and Montreal Cognitive Assessment demonstrated *mild cognitive impairment*, and the resulting assessed functional impairments. (Tr. 706.) This is error. *See Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished) (an ALJ can discount findings to the extent they relied on subjective complaints found to be incredible, but must give reasons for rejecting objective assessment); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (finding the ALJ was free to reject a treating psychologist's opinion where it appeared to be based on subjective complaints and isolated instances "rather than objective findings"). The ALJ also stated broadly that Dr. Davis's assessment was based on "erroneous" information because there was medical evidence that indicated Mr. Parraz responded favorably to medication and treatment, and record evidence that indicated Mr. Parraz occasionally traveled alone, sporadically cared for his young niece, and reported an ability to get around and function. (Tr. 30.) However, Dr. Davis considered, *inter alia*, Mr. Parraz's compliance with his medication regimen and treatment (Tr. 707), and his activities of daily living (Tr. 705), when she made her diagnoses and assessment. Moreover, the medical records indicate that despite Mr. Parraz's favorable response to medication and treatment, his treatment providers' diagnoses and assigned GAF scores remained consistent over the course of his ongoing treatment.[21] As such, it is mere speculation that Mr. Parraz's favorable response to medication and treatment rendered him less restricted in his

---

[21] *See* fn. 11, *supra*.

ability to do work related mental activities than Dr. Davis assessed. *Robinson*, 366 F.3d at 1083; *McGoffin,* 288 F.3d at 1252. Further, the Tenth Circuit has held that an ALJ's reliance on sporadic and intermittent performance of daily activities to establish that a claimant is capable of engaging in substantial gainful activity is insufficient when a claimant's medical complaints are supported by substantial evidence. *See generally Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (finding that the ability to do minor house chores and drive for brief intervals does not undercut allegations of disabling pain); *see also Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983) (finding that sporadic performance of a few household tasks, working on cars, and driving on occasional recreational trips did not establish that a person was capable of engaging in substantial gainful activity). Here, the medical evidence supports Mr. Parraz's history of mental impairments, and the ALJ has failed to demonstrate how Mr. Parraz's engaging in sporadic and limited daily activities undercuts Dr. Davis's evaluation and assessment of Mr. Parraz's ability to engage in substantial gainful activity and to do work related mental activities. *Frey*, 816 F.2d at 517. Finally, Dr. Davis's evaluation and assessment is consistent with other medical evidence in the record.[22]

For the foregoing reasons, the Court finds that the ALJ's explanations for discounting Dr. Davis's evaluation and assessment are not supported by substantial evidence.

### C.     Remaining Issues

The Court will not address Mr. Parraz's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

---

[22] Mr. Parraz's treating provider, Jennifer Webb, LPCC, similarly assessed Mr. Parraz's ability to do work related mental activities. *See* Section III.A, *supra*. CNP-BC Maureen Kolomeir similarly assessed Mr. Parraz's ability to do work related mental activities. (Tr. 666-67.)

## IV. <u>Conclusion</u>

For the reasons stated above, Mr. Parraz's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 18) is **GRANTED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**